IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CLARABEL ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:04-cv-697-GPM |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter has been referred to Magistrate Judge Donald G. Wilkerson by Chief District Judge G. Patrick Murphy pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on the Petition for Review of the Commissioner's Decision Awarding Benefits (entitled "Complaint") filed by the Plaintiff, Clarabel Allen, on November 4, 2004 (Doc. 5).  For the reasons set forth below, it is **RECOMMENDED** that the Plaintiff's petition be **DENIED**, that **JUDGMENT** be entered in favor of the Defendant and that the Court adopt the following findings of fact and conclusions of law:

### FINDINGS OF FACT

#### PROCEDURAL HISTORY

The Plaintiff, Clarabel Allen ("Allen"), filed an application for Disability Insurance Benefits ("DIB") under Title II and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 416(I), 423 and 1382c[1] on March 21, 2002 alleging an onset date of March 4, 2002.  (Tr. 25,64-66).  Allen's applications were based on a combination

---

[1] The exhibits pertaining to the Allen's application for Supplemental Security Income were not available for the transcript. (Tr. 2A).

of mental and physical impairments, including depression, arthritis, and carpal tunnel syndrome (Tr. 56, 62).  The claim was initially denied on July 24, 2002 (Tr. 52) and upon reconsideration (Tr. 59-61).  A hearing was held on October 16, 2003 (Tr. 35).  Administrative Law Judge ("ALJ") William E. Kumpe issued a fully favorable decision, granting Allen's DIB and SSI applications on January 30, 2004 (Tr. 21).  The ALJ found that Allen was entitled to DIB and SSI with an onset date of March 4, 2002 (Tr. 29-30).  On March 24, 2004, Allen filed a request for review of the ALJ's opinion to the Appeals Counsel, alleging an onset date in 1994 (Tr. 6).  On August 6, 2004 the Appeals Council denied Allen's request for review, thus making the decision of the Commissioner final (Tr. 3).  Allen, acting pro se, filed her Complaint with this Court on September 28, 2004 (Doc. 1).  In an Order dated October 4, 2004 (Doc. 4), Allen was instructed to file an amended complaint on a blank form provided by the Clerk's Office.  Allen filed her amended complaint on November 5, 2004 (Doc. 5).

## SUBSTANTIVE HISTORY

On September 5, 2002 Allen was determined not to be disabled (Tr. 49).  On August 14, 2002 Allen filed a Request for Reconsideration (Tr. 57-58).  On September 11, 2002, Allen's Request for Reconsideration was denied (Tr. 59-62).  On September 19, 2002, Allen requested a hearing by an ALJ (Tr. 63).  A Notice of Hearing was issued on August 22, 2003 (Tr. 31-34A). On October 13, 2003, a hearing was held before the ALJ (Tr. 35-47).   Allen was represented by counsel (Id.).  Allen was the sole witness at the hearing (Id.).  At the hearing, all administrative records were admitted into the record of the hearing (Tr. 37).  At the hearing, Allen was wearing a splint on her right hand (Tr. 37-38).  Allen testified that she had problems with her knee and back (Tr. 38).   She further testified that her doctor, Dr. Chan [sic], told her in

either May or June of 2003 that she was disabled (Tr. 38).   Allen testified that the doctor gave her restrictions on what activities she could perform (Tr. 39).   Allen further testified that she was seeing Dr. J. B. Thomas for post-traumatic stress disorder and nerves (Tr. 39-40).[2]   At the time of her hearing, Allen alleged that she still had problems with her nerves (Tr. 40).   Allen testified that she suffered from leg cramps (Tr. 40).   She further testified that she suffered from headaches, hallucinations and nightmares (Tr. 40-41).   At the hearing, the ALJ determined that he would have two consultative evaluations performed on Allen, one, an orthopedic evaluation of her back and joints and the second, a psychological evaluation (Tr. 41-42).   The ALJ stated that he would review those evaluations with any additional information submitted by Allen (Tr. 42).   He would then decide whether to award her benefits or hold another hearing (Tr. 42).

In her work history report, Allen wrote that on October 4, 1994, while she was helping a patient into the patient's bed, she felt something "pop" in her hand and go through her body (Tr. 129, 136).  Her wrists turned limp and the skin turned black (Tr. 129).   She reported that her doctors told her she had a strained, torn, and pulled ligament and that she attempted physical therapy, but was still in pain (Tr. 129).   In her written work history report, Allen wrote that this was a worker's compensation case (Tr. 129).   Additionally, Allen wrote that a bone fragment went through her veins and landed in her head (Tr. 136).   She felt a pinching sensation on the right side of her head and sometimes in her right eye and both hands (Tr. 136).   In her work history report, Allen listed her prescription medications (Tr. 162-167).   The earliest given date of her prescribed medicines taken for pain was January 21, 2002 (Tr. 162).

Allen had an x-ray of her right hand and right elbow on October 7, 1994 (Tr. 180-181).

---

[2] Dr. Thomas's notes are not part of the record.

According to Dr. Johnson, the x-ray of her right hand revealed "normal bone tissue and density without evidence of fracture, dislocation, or abnormal soft tissue calcification." (Tr. 180). Dr. Johnson also opined that the x-ray of the Allen's right elbow revealed "hypertrophic changes effect the coranoid process of the Ulna" but found no fracture (Tr. 180). On August 18, 1998, Dr. D.D. Hageman found that x-rays of Allen's left hand showed "mild degenerative changes of the interphalangeal joint of the left thumb" but that there were no fractures, dislocation or bony destruction (Tr. 182). Dr. Hageman found that x-rays of Allen's right hand showed an "old un-united small chip fracture of the distal aspect of the middle phalanx right middle finger" and "mild degenerative arthritic changes of the first metacarpal phalangeal joint and interphalangeal joint of the thumb" but that was "no evidence of acute fracture, dislocation or bony destruction." (Tr. 183). Dr. Hageman also found that x-rays of Allen's right humerus were negative and noted "no evidence of fracture, dislocation or bone destruction" and "no periosteal reaction." (Tr. 184).

In January 2002, Allen began seeing Dr. Prieb, of the Vascular & Hand Surgery, Ltd. (Tr. 175). Dr. Prieb's notes stated that Allen claimed she was injured in 1994 (Tr. 171). A medication list dated January 21, 2002, from Vascular & Hand Surgery Ltd. indicated that Allen took pain relievers (Tr. 174). Dr. Prieb prescribed Motrin 800mg on January 21, 2002 (Tr. 176). Dr. Prieb ordered a nerve conduction study of the upper extremities on January 22, 2002 (Tr. 177). On January 23, 2002, Dr. Anwar Khan performed a nerve conduction study (Tr. 186-7). Dr. Khan's interpretation was consistent with advanced bilateral carpal tunnel syndrome (Tr. 187). In a February 4, 2002 letter to the Plaintiff's treating physician Dr. Chand, Dr. Prieb

recommended decompression of the right carpal tunnel (Tr. 189). He also noted a mellet deformity to the left little finger and that the Phalen's sign was positive bilaterally (Tr. 189).

Dr. Prieb's notes from February 4, 2002 indicated that Allen complained of frequent headaches and numbness to bilateral hands (Tr. 192). The notes further indicated that Allen's pain in her hand and wrists was "getting worse." (Tr. 192). Dr. Prieb's impression was advanced bilateral carpal tunnel syndrome (Tr. 192). Allen was scheduled to have surgery on her right carpal tunnel on April 9, 2002 (Tr. 190). On April 5, 2002, a history was prepared by a nurse, Tonya Becker, in preparation for Allen's planned decompression of the right carpal tunnel (Tr. 190). Becker noted the primary diagnosis of right carpal tunnel syndrome (Tr. 190). She indicated that Allen presented with complaints of numbness to her hands bilaterally and to the fingers. Allen stated that she was able to only lift five pounds due to the increased pain to her hands and her wrist (Tr. 190). Allen stated that this condition had gotten "progressively worse." (Tr. 190). Allen's medications at the time included and pain pills as needed (Tr. 190). On April 9, 2002, Dr. Prieb performed a decompression of her right carpal tunnel (Tr.111, 191, 193). Allen was prescribed Tylenol #3 (Tr. 114, 191). Dr. Prieb stated that Allen "tolerated the procedure well." (Tr. 193).

On May 6, 2002, Dr. Prieb noted stiffening of the fingers in Allen's right hand and that she complained of severe headaches (Tr. 202). He recommended an x-ray of Allen's right hand and a CT brain scan (Tr. 202). On May 6, 2002, Dr. J.A. Mattingly conducted an x-ray of Allen's right hand (Tr. 208). Dr. Mattingly's impression was "worsening degenerative changes felt most consistent with worsening osteoarthritis at the third distal interphalangeal joint as well as the second proximal and distal interphalangeal joints (Tr. 208). On June 3, 2002, Dr. Prieb's

notes reflected that Allen complained of swelling to right hand and wrist area (Tr. 204). He indicated that x-rays of Allen's right hand showed worsening degenerative changes (Tr. 204). Allen was unable to be referred to the hand clinics at either SLU or Barnes Hospital because neither clinics accepted self-pay patients (Tr. 204-5). Dr. Prieb's notes from June 19, 2002 urged Allen to find a primary care physician (Tr. 205). In a July 1, 2002 letter to Dr. Chand, Dr. Prieb stated that she referred Allen to a hand clinic in St. Louis but she has refused occupational therapy because she believed there was a bone fragment in her right middle finger that might dislodge if she went for therapy (Tr. 206). Dr. Prieb stated that no such fragment was noted in the x-ray (Tr. 206). The letter indicated that Allen has flexion deficits to all of her fingers on her right hand (Tr. 206).

On May 30, 2002, Dr. Stanley Rabinowitz performed a consultative examination (Tr. 209-213). He stated that the Allen had a history of joint pain and carpal tunnel syndrome for at least eight years (Tr. 209). He noted that the Allen "apparently" developed right carpel tunnel syndrome in her October 4, 1994 incident (Tr. 209). Allen claimed that bone fragments from her hand have moved from her hand to her neck, but Dr. Rabinowitz noted that the circumstances surrounding this claim were unclear (Tr. 209). Dr. Rabinowitz indicated that the Allen's carpal tunnel has not improved after her surgery, but the reasons for this were not clear (Tr. 211). Dr. Rabinowitz's impression was degenerative joint disease, history of bilateral carpal tunnel syndrome, status post right carpal tunnel release surgery with unknown efficacy, and history of chronic depression (Tr. 212).

On July 10, 2002 Dr. Rock ( a Disability Determination Services "DDS" physician), performed a physical residual functional capacity assessment (Tr. 236-43). Dr. Rock limited

Allen to light work (Tr. 237). He also found Allen had limited ability to push/pull with her right hand (Tr. 237), and was limited in her gross and fine manipulation with her right hand (Tr. 239). He opined that Allen could frequently lift and/or carry 10 pounds and occasionally 20 pounds (Tr. 237). Further, he stated that Allen could sit and stand/walk approximately 6 hours in an 8-hour work day (Tr. 237).

On June 2, 2002, Michael W. Stempniak Ph.D, a clinical psychologist, conducted a mental status consultive examination of Allen (Tr. 214-217). Allen indicated to Dr. Stempniak that her present illness (depression) began about 1994 and gradually grew worse (Tr. 214). She also reported a history of sexual abuse (Tr. 215).[3] Dr. Stempniak diagnosed Allen with chronic post-traumatic stress disorder, recurrent major depressive disorder, borderline intellectual function, with a history of arthritis and carpal tunnel syndrome (Tr. 216).

On June 24, 2002, DDS psychologists M.A. Whorton, Psy.D., Emily R. Vincent, M.A., and Donald Henson, Ph.D. conducted a review of the exhibit file (Tr. 218-231). They concluded that Allen had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace (Tr. 228). Additionally, they opined that Allen was moderately limited in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to work in coordination with or in proximity to others without being distracted by them, to interact appropriately with the general public, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 232-233).

---

[3] Allen stated that she was raped by an ex-boyfriend of a friend when she was in her teens, and then 4 to 5 times since then by other people (Tr. 215). She stated that she used to have nightmares about this, and now thought she has demons touching her and feeling her (Tr. 215).

On June 24, 2002, the Agency conducted a phone interview with Allen's mother, Clara Rogers (Tr. 143). Rogers denied any knowledge of Allen's delusions. Additionally, Rogers reported that Allen does not have any anxiety, is not suspicious of others and not argumentative (Tr. 144).

On November 6, 2003, clinical psychologist Dr. Michael W. Stempniak again conducted a mental status consultative of Allen (Tr. 271-275). Allen, inartfully informed Dr. Stempniak that she had an accident at work in 1994 while helping to lift a patient "with popping a vein in her right arm and chipping a bone and tearing ligament.. ." (Tr. 271). She said these bone fragments from her elbow went to her finger and head resulting in pain in both places (Id.). She also reported sexual abuse, physical abuse and to hearing voices (Id.)[4]  Dr. Stempniak diagnosed Allen as having chronic post-traumatic stress disorder, recurrent, moderate major depressive disorder with a history of carpal tunnel syndrome in her right hand, breathing problems and arthritis (Tr. 274). Dr. Stempniak completed a medical source statement (mental) (Tr. 276-277). Dr. Stempniak opined that Allen was moderately impaired in her ability to understand and remember detailed instructions, in her ability to carry out detailed instructions, in her ability to interact appropriately with supervisor(s), coworkers, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting (Tr. 276-77).

On November 24, 2003 orthopedic specialist Dr. Bruce T. Vest Jr. conducted a consultative examination of Allen (Tr. 278-280). He also completed a physical residual

---

[4] Allen reported being raped over a period of years by various strangers from the age of 17-21 which she indicated caused severe problems (Tr. 272, 274).

functional capacity assessment of Allen (Tr. 281-284).  His impression was chronic lumbar pain secondary to degenerative disc disease of the lumbar spine, degenerative arthritis of both knees, and a history of hypertension (Tr. 279).  Dr. Vest opined that based upon Allen's history and his examination, she has a great deal of difficulty standing, sitting, walking and lifting (Tr. 279, 281-284).  He further opined that it would be difficult for Allen to perform any occupation, including a sedentary occupation (Tr. 280).  He also noted that Allen appeared to have at least mild carpal tunnel syndrome bilaterally and that could cause difficulty if she were to use her hand repetitively (Id.).

## CONCLUSIONS OF LAW

The standard for judicial review of an ALJ's finding is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive..."); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003); Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001); See also White v. Barhnart, 415 F.3d 654, 659 (7th Cir. 2005)(stated that "the reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility")(internal quotation marks and citation omitted).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1972)(quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  See also Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of

9

law.  Golembiewski, 322 F.3d at 915; Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues."  Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).

      Supplemental Security Income is available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. § 416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity."  20 C.F.R. § 416.920(b).  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits...physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. § 401, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.  20 C.F.R. § 416.920(e).  However, if the claimant shows that his impairment is so severe that he is unable to

engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §416.920(f).

In the request for review of the hearing decision order and in her complaint, Allen claims that her "condition began in 1994." (Tr. 6). It should be noted at the outset that the 7th Circuit stresses that the "onset date is determined by the date when the impairment *became disabling and not just present*." Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). Thus, this Court must look not to whether the Plaintiff's ailments started before the onset date of March 4, 2002, but to whether the Plaintiff's disability started before this onset date.

Allen's assertion that she is entitled to SSI benefits beginning in 1994 is foreclosed because Allen is not eligible for those benefits for any date preceding her initial application on March 21, 2002. Federal regulations state that "the earliest month for which we can pay you benefits is the month following the month you filed the application" for disability. 20 C.F.R. § 416.335. The regulation continues "[i]f you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month." 20 C.F.R. § 416.335. Social Security Ruling 83-20 (SSR) states that for Title XVI benefits, "there is no retroactivity of payment" and, except for alien cases, "the only instances when the specific date of onset must be separately determined . . . is when the onset is subsequent to the date of filing or when it is necessary to determine whether the duration requirement is met." SSR 83-20, p. 1. The 7th Circuit notes that "SSI benefits are payable as of the application date." O'Kane v. Apfel, 224 F.3d 686, n. 1 (7th Cir.

11

2000). See also Brown v. Massanari, 167 F..Supp.2d 1015, n. 2 (N.D. Ill. 2001)("SSI claimants cannot receive benefits for any period before their date of application"). Thus, even if the Allen's disability onset date was in 1994, she is ineligible to receive Supplemental Security Income payments for the month of her application or any month preceding her application.

If the ALJ erred in determining Allen's onset date, the maximum amount of additional payment possible is 12 months of retroactive Disability Insurance Benefits. This is because DIB may be awarded up to twelve months preceding the date of a claimant's initial application for benefits. The Social Security Act states that "[a]n individual who would have been entitled to a disability insurance benefit for any month had he filed application therefore before the end of such month shall be entitled to such benefit for such month if such application is filed before the end of the 12th month immediately succeeding such month." §223 Social Security Act; 42. U.S.C.A. 423(b). Social Security Ruling 83-20 states that DIB "may be paid for as many as 12 months before the month an application is filed. Therefore, the earlier the onset date is set, the longer is the period of disability and the greater the protection received." SSR 83-20, p.1. The 7th Circuit notes that "one can collect DIB under Title II that covers up to 12 months of disability prior to the filing of a DIB application, provided that one had insured DIB status during that period of disability." Perkins v. Chater, 107 F.3d 1290, 1295 (7th Cir. 1997). See also, Rice v. Apfel, 8 F. Supp.2d 769, n. 1 (N.D. Ill. 1998)("An individual can collect DIB under Title II that covers up to twelve months of disability prior to the filing of a DIB application, provided that he had insured DIB status during that period of disability").

In order to receive the full 12 months of retroactive payment, Allen would have to be found disabled for at least 17 months before the initial application date. This is because the

12

regulations require a claimant to be disabled for 5 consecutive months before DIB can be payed. 20 C.F.R. § 404.315. The regulation further states that "[y]our waiting period can begin no earlier than the 17th month before the month you apply -- no matter how long you were disabled before then." 20 C.F.R. § 404.315. Because of this 5 month waiting period, for Allen to receive any additional DIB, she would have to be found disabled at least 6 months before her current onset date of March 4, 2002. The only exception to the 5 month waiting period is "if you were previously entitled to disability benefits or to a period of disability under § 404.320 any time within 5 years of the month you again became disabled." 20 CFR § 404.315. Because Allen was not previously entitled to a disability benefits under 20 CFR § 404.320, this exception does not apply.

Social Security Ruling 83-20 provides the analytical framework for determining a claimant's onset date. See Briscoe ex rel. Taylor v. Barnhart, 425 at 352 (7th Cir. 2005). The ruling states that "the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." SSR 83-20, p. 1. Further, "[t]he weight to be given any of the relevant evidence depends on the individual case." SSR 83-20, p. 1. The claimant's alleged onset date is the "starting point" in this determination. SSR 83-20, p. 1. When analyzing the work history, "[t]he day the impairment caused the individual to stop work is frequently of *great significance* in selecting the proper onset date." SSR 83-20, p. 2 (emphasis added). However, "medical evidence serves as the *primary element* in the onset determination." SSR 83-20, p. 2 (emphasis added).

The ALJ did not mention SSR 83-20 because at the time of his opinion, Allen's alleged onset date was March 4, 2002 (Tr. 25). He decided that Allen was disabled as of this onset date

13

(Tr. 29-30). Allen first amended her onset date in her request for review of the ALJ's decision, claiming that her onset date was in 1994 (Tr. 6). Because Allen amended her onset date after the ALJ's opinion, the record is not fully developed as to that issue. However the record does contain substantial evidence which supports the ALJ's onset date determination.

**SSR 83-20: Work History**

The strongest evidence in the record that support's the ALJ's onset date determination is Allen's work history. Allen worked as a nurse's assistant at four different nursing from 1994 to 1998. From May 1994 to October 1994, Allen worked at Swansea Care Center (Tr. 122). She left this job after her earlier described incident while lifting patients (Tr. 129). Thus, the alleged onset date would be the date she quit this job.

The Commissioner asserts that her earnings are high enough in1994, 1995, 1996, 1997, 2000, 2001, and 2002 to create a presumption of Substantial Gainful Activity under 20 C.F.R. § 404.1574. (Defendant's Brief, 8). Based on the earnings table Allen did engage in Substantial Gainful Activity in 1995, 1996, and 1997. 20 C.F.R. 404.1574 (Table 1). The year 1994 is not relevant because her onset date would not have occurred before October 1994. The record is not fully developed for the years from 1999 to 2002, so a precise determination is not possible.

Allen worked as a nurse's assistant at River Bluffs Nursing Home from March 1995 to September 1996 and again from April 1997 to April 1998 (Tr. 122). At this job, Allen walked or stood for 6 hours per day, stooped for 30 minutes to an hour per day, kneeled approximately 20 to 30 minutes per day, and crouched 15 to 20 minutes per day (Tr. 126, 127). She stated that she, along with another nurse's assistant, would lift patients from the wheelchair to the bed (Tr. 126, 127). She stated that she supervised 2 to 6 people during orientation (Tr. 126, 127).

14

Allen worked as nurse's assistant for Four Fountains Nursing Home from January 1998 to April 1998 (Tr. 122). She reported similar job duties (Tr. 128). Allen worked laundry at the Virgil Calvert Nursing Home from February 1999 to August 1999 (Tr. 122). She reported that she stood for 5 hours per day and walked for 1 hour per day (Tr. 130). She lifted nothing heavier than laundry (Tr. 130).

Allen's most recent jobs were as a housekeeper and an office cleaner. Allen stated that she worked as a housekeeper at Virgil Calvert Nursing Home from August 1999 to March 2002 (Tr. 122). She stated that she worked 7 hours per day for 5 days a week at the Virgil Calvert Nursing Home (Tr. 132). She walked 5 hrs, stood 30 minutes, sat 1 hour, kneel 20-25 minutes, crouched 15-20 minutes and stooped for 30 minutes (Tr. 132). Significantly, she supervised 2 to 4 people during orientation (Tr. 133). Her last day as a housekeeper was March 4, 2002 (Tr. 108).

Allen worked a second job as an office cleaner from May 2001 to March 2002 (Tr. 122). She worked as an office cleaner 5.75 hours per day for 5 days a week (Tr. 134). She walked or stood for 5.5 hours per day, kneeled for 20 minutes, crouched 15 minutes, sat 15 minutes and stooped 30 minutes (Tr. 134). Her last day as an office cleaner was March 29, 2002 (Tr. 103)

**SSR 83-20: Medical Evidence**

Allen's medical history does suggest that her physical and mental conditions became progressively worse over time. Allen's alleged onset date apparently stems from her work incident in October of 1994. The only medical evidence obtained prior to the determined onset date are the x-rays from 1994 and the x-rays from 1998. The 1994 x-rays of Allen's right elbow suggest hypertrophic changes effecting the coranoid process of the Ulna. The 1994 x-ray of her

15

right hand were negative. The 1998 x-ray of Allen's right humerus were negative. The 1998 x-ray of her left hand were negative except for mild degenerative changes of the interphalangeal joint of the left thumb. The 1998 x-ray of her right hand was negative except for mild degenerative changes of the first metacarpal phalangeal joint and interphalangeal joint of the thumb and a small chip fracture of the middle finger. No medical assessment was made at these times indicating functional capacity. The record contains no evidence suggesting that these x-rays were disabling findings.

The only other sources of medical evidence from this time period are her statements to doctors concerning her medical history. According to the Dr. Prieb's nurse's notes from April 5, 2002, Allen stated that numbness and tingling to both her hands and her fingers with pain in her hands and wrists had gotten "progressively worse." Dr. Stempniak noted that Allen reported being a history of sexual abuse between the ages of 17 and 21 which she indicated caused severe problems. She stated that she used to have nightmares about her sexual abuse and now thought she had demons touching her and feeling her.

Even if it were possible that Allen's disability began before her determined onset date, the medical evidence does not provide for a precise determination of the onset date. Social Security Ruling 83-20 provides guidance for when an onset date is not precisely determinable. When the onset date must be inferred, it "should be set on the date when it is *most reasonable* to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity)" SSR 83-20, p, 3; <u>Briscoe ex rel. Taylor</u>, 425 F.3d at 356(emphasis added). Based on Allen's medical evidence and work history, the date that Allen left her job is the "most reasonable."

For the reasons set forth above, it is **RECOMMENDED** that the Petition for Review of the Commissioner's Decision (entitled "Complaint") filed by the Plaintiff, Clarabel Allen, on November 5, 2004 (Doc. 5) be **DENIED** and that the Judgment be **AFFIRMED** and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties shall have ten (10) days after service of this Recommendation to file written objections thereto. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004); United States v. Hernandez-Rivas, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED:  February 7, 2006.**

> **s/Donald G. Wilkerson**
> **DONALD G. WILKERSON**
> **United States Magistrate Judge**